**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

| | |
|---|---|
| KRISTEN NOEL DAVIS,<br><br>*Plaintiff,*<br><br>v.<br><br>HCA HEALTH SERVICES OF TENNESSEE, INC.<br>D/B/A TRISTAR SOUTHERN HILLS MEDICAL<br>CENTER, AMY HIGGINS, JENNIFER GARRETT,<br>and JEFFREY DYKES<br><br>*Defendants.* | Case No.<br><br><br>**JURY DEMAND** |

## COMPLAINT

Comes now, Plaintiff, Kristen Noel Davis ("Plaintiff" or "Mrs. Davis"), by and through her undersigned counsel, and by way of her Complaint against Defendants HCA Health Services of Tennessee, Inc. d/b/a TriStar Southern Hills Medical Center ("Southern Hills"), Amy Higgins ("Ms. Higgins"), Jennifer Garrett ("Ms. Garrett"), and Jeffrey Dykes ("Mr. Dykes") (collectively, the "Defendants"), alleges as follows:

## THE PARTIES

1.      Plaintiff, Mrs. Davis is an individual who resides within this Judicial District.

2.      Upon information and belief, Defendant Southern Hills is a medical center with principal place of business at 391 Wallace Road, Nashville, TN 37211. Upon further information and belief, Southern Hills is a wholly owned subsidiary of HCA Health Services of Tennessee, Inc. ("HCA"). HCA is a Tennessee Corporation and may be served by way of its registered agent: C T Corporation System, 300 Montvue Road, Knoxville, TN 37919-5546.

3.      Upon information and belief, Defendant Amy Higgins is an individual who resides within this Judicial District. At all times relevant to this action, Ms. Higgins served as Southern Hills' Chief Nursing Officer ("CNO").

4.      Upon information and belief, Defendant Jennifer Garrett is an individual who resides within this Judicial District. At all times relevant to Plaintiff's Complaint, Ms. Garret served as Vice President of Human Resources for Defendant Southern Hills.

5.      Upon information and belief, Defendant Jeffrey Dykes is an individual who resides within this Judicial District. Starting September 20, 2021 through all relevant times to this Complaint, Mr. Dykes was the Director of the Emergency Room.

## JURISDICTION AND VENUE

6.      This Court has Subject Matter Jurisdiction pursuant to 28 U.S.C. § 1331, *et seq.* as Plaintiff's claims arise under Title VII of the Civil Rights Act as codified at 42 U.S.C. §§ 2000e - 2000e17 (as amended).

7.      This Court has Supplemental Jurisdiction over Plaintiff's State Law Claims under 28 U.S.C. § 1367 as they arise from the same nexus of operative facts and are so related to Plaintiff's claims under Title VII of the Civil Rights Act such that they form part of the same case or controversy under Article III of the United States Constitution.

8.      This Court may exercise Personal Jurisdiction over Defendant Southern Hills as it maintains its principal place of business within the District. As such it has purposefully availed itself of the laws of the State of Tennessee and is considered generally "at home" within the District.

9.      This Court may exercise Personal Jurisdiction over Defendant Amy Higgins as she is an individual who resides within this District and because all of her suit-related conduct occurred within this district and was directed at Plaintiff who also resides within the District.

10.     This Court may exercise Personal Jurisdiction over Defendant Jennifer Garrett as she is an individual who resides within this District and because all of her suit-related conduct occurred within this district and was directed at Plaintiff who also resides within the District.

11.     This Court may exercise Personal Jurisdiction Defendant Jeffrey Dykes as he is an individual who resides within this District and because all of his suit-related conduct occurred within this district and was directed at Plaintiff who also resides within the District.

12.     Venue is proper pursuant to 28 U.S.C. § 1391 as each Defendant resides or is located within this State and Judicial District. Further, Venue is proper within this District as all of the acts and omissions which give rise to Plaintiff's Claims occurred within this District.

13.     Plaintiff has fulfilled the requirement to exhaust her administrative remedies. To wit, on June 13, 2022, Mrs. Davis timely lodged her complaint against Southern Hills regarding the conduct described herein with the Equal Employment Opportunity Commission. On June 14, 2023, the Commission issued Mrs. Davis her right to sue letter.

## FACTUAL AND PROCEDURAL HISTORY
*Antecedent Events*

14.     Plaintiff was employed by Southern Hills starting April 4, 2016 as a nurse in the Emergency Room.

15.     In August 2018, Southern Hills named Kevin Saunders as the interim director of the Emergency Room.

16. In September of 2018, Plaintiff was promoted to Charge Nurse. Shortly thereafter in November 2018, Mr. Saunders terminated the Charge Nurse position to "Clinical Nurse Coordinator".

17. Plaintiff was, thus, demoted and asked to re-apply for the same job under the new title "Clinical Nurse Coordinator".

18. On December 28, 2018, on a recorded conversation, Mr. Saunders advised Plaintiff that she was not selected for the Clinical Nurse Coordinator position and was not considered for the same position on Night Shift because she was a "young, married woman with young children at home."

19. Three days later, Plaintiff filed a complaint to the Ethics and Compliance Officer, Cory Mead.

20. Mr. Saunders was fired January 7, 2019.

21. However, since that time, Plaintiff has been subjected to a hostile work environment as a result of filing her complaint against Mr. Saunders. Since that time, she has faced constant humiliation and jokes at her expense about whether or not she was recording subsequent conversations.

22. Mrs. Davis, however, continued to work in her demoted position of a staff nurse until October 2019 when she was offered a newly available Clinical Nurse Coordinator position on Night Shift.

23. Plaintiff worked as the Night Shift Clinical Nurse Coordinator until July of 2020 when she transitioned back to Day Shift, continuing as Clinical Nurse Coordinator.

24. Plaintiff continued to serve in that role until September 27, 2021. On September 5, 2021 due to the passing of her paternal grandfather, she requested to transition to a PRN role to be

more available to travel to Panama City, Florida to assist with the care of her grandmother who suffers from dementia.

*Mr. Dykes and the Manager Positions*

25. Mr. Dykes was named the ER Director on or around September 20, 2021 – just days after his September 15, 2021 interview.

26. Upon information and belief, he was the only candidate interviewed.

27. Despite her recent shift to the PRN role, which is considered a "part-time" position, Plaintiff maintained (as much as possible) her full-time hours, and continued to serve as a charge nurse on many of the shifts. (By this time, the role of Clinical Nurse Coordinator had been unofficially, but practically, phased out and the lead nurse position of any given shift was once again the Charge Nurse.) Indeed, Plaintiff actively assisted Mr. Dykes in his transition to the Director role helping him by teaching him how to use the relevant forms, assisting with staffing issues, and actively involved in ensuring that processes and procedures complied with relevant statutes and regulations – especially EMTALA.

28. On or around September 28, 2021, Plaintiff advised Southern Hills' CEO Joanna Conley of her interest in the open ER Manager position.  Ms. Conley forwarded Plaintiff's email to Mr. Dykes and Ms. Higgins. Ms. Higgins responded on September 29, 2021 advising that the first step was to speak with Mr. Dykes. Ms. Higgins also confirmed that she will "validate" Plaintiff's interest in the position and ensure that it gets posted for open applications.

29. Pursuant to Ms. Higgins' suggestion, Plaintiff met with Mr. Dykes a few days later. Mr. Dykes actively discouraged Plaintiff from applying.  Instead of discussing the role and whether or not Plaintiff would be a good fit for it, as was Ms. Higgins' direction, Mr. Dykes stated multiple times that he had already selected his friend from another facility for the position and that said

friend had already accepted. This meeting with Mr. Dykes occurred *before* it the position was publicly posted for applications, but *after* Ms. Higgins had "validated" Plaintiff's interest in the position.

30.     Disheartened by and in relaince on her conversation with Mr. Dykes, Plaintiff elected not to take further action with regard to the Manager Position.

31.     Eventually, the position was Filled by Mr. Locklayer – and not, in fact, Mr. Dykes' aforementioned "friend" from another facility.

32.     Upon information and belief, and without any notice to Plaintiff whose interest in a management position had already been "validated," a second management position was posted on December 21, 2021 – a date Mr. Dykes knew that Plaintiff would be out of town for the Christmas holidays.

33.     This second position was filled December 28, 2021, the day of Plaintiff's return to work after the Holidays.

34.     That same day, Mr. Dykes invited Plaintiff into his office during her shift, and immediately upon her entrance to his office, directly stated "Kristen, I just wanted to let you know that I didn't consider you for the manager position because, you know, you have young kids at home – I didn't think you would want it."

35.     This was how Plaintiff learned that there even was a second management position, but that it had been filled.

36.     Visibly upset, from learning that *for a second time in three years* that her age, gender, marital status and status as a mother had impacted Southern Hills' decision on whether or not to promote her, Plaintiff, nevertheless endeavored to return to her assignment. Mr. Dykes followed her and asked what he could to "fix this."

37.     Plaintiff replied, simply and professionally, that she didn't want her age, gender, my marital status, or my status of a mother to have any impact on the hiring decisions.

38.     Plaintiff asked Mr. Dykes to confirm that he had made those comments while he was there in the nurses' station in the presence of Plaintiff's colleague, Patrice Carter. There in the presence of Ms. Carter, Mr. Dykes admitted to having made the statements that he did not consider her for the management position because of her status as a young mother with young children.

39.     Upon information and belief, between December 21, 2021 and December 28, 2021, Mr. Dykes posted and filled the second manager position.

40.     Mr. Dykes selected Mr. Keith Malugin, a male with far less experience than Plaintiff. Upon information and belief, Mr. Malugin was licensed as a nurse in 2019 (by which time, Plaintiff had already been working for Southern Hills for three years), and had only been serving as a charge nurse for approximately a year when he was selected by Mr. Dykes.

*Plaintiff Lodges an Internal Ethics Complaint and the "Meeting" that Followed*

41.     Plaintiff promptly sought, in good faith, to lodge an internal ethics complaint given Mr. Dykes' discriminatory hiring practices. However, given that the Southern Hills' COO had resigned and had not been replaced, there was no EEOC Compliance officer for the hospital at the time.  Thus, Plaintiff, unsure of what else to do, emailed, Southern Hills' CEO, Joanna Conley, CNO Amy Higgins, and VP of HR Jennifer Garret, with Mr. Dykes on copy advising of Mr. Dykes' comments and requested a meeting for the stated purpose of filing a good-faith, formal complaint of discriminatory behavior.

42.     The meeting was set for December 30, 2021.

43.     It did not go well.

44.     Ms. Higgins started the meeting with a comment, at Plaintiff's expense, that she was not recording because she didn't appreciate "anyone being recorded with out their knowledge."

45.     Ms. Higgins continued the meeting, showing no intent of investigating Plaintiff's claims regarding Mr. Dykes' discriminatory conduct. Instead, Ms. Higgins took the opportunity during the meeting that Plaintiff *asked for* to chastise her for making the complaint. Indeed, rather than discuss the content of the facially patent discriminatory statements by Mr. Dykes, Ms. Higgins called Plaintiff unprofessional for emailing the senior staff. (Again, there was no Ethics Compliance Officer at this time, so Plaintiff lodged her complaint with people whom she believed in earnest to be the correct parties.)

46.     Ms. Higgins also called Plaintiff unprofessional for crying in response to Mr. Dykes' discriminatory comments. Continuing her lecture on "professionalism," Ms. Higgins then pivoted to a diatribe about how it was also called unprofessional for "continuing" the conversation in front of patients. This alone is indicative that Ms. Higgins had no interest in learning about what actually happened – because again, the continuation of the conversation occurred at the nurses' station because of Mr. Dykes' insistence (not Plaintiff's) and his attempts to try to "fix this."

47.     Rather than discussing Mr. Dykes' conduct, or asking Ms. Carter if she could corroborate Plaintiff's story, or conducting *any* investigation into the merits of Plaintiff's claims, the *entire* meeting was the focus of Plaintiff's conduct in the wake of Mr. Dykes' comments, not, the comments themselves.

48.     Ms. Higgins' beratement of Plaintiff lasted for approximately an hour, including comments like "What were you even thinking when you decided to email me and the CEO about this?". Ms. Higgins also discouraged Plaintiff from making a formal ethics complaint, by

informing Plaintiff, for the first time that she would not have been eligible for the management rather, because her PRN status precluded Plaintif from even applying. Of course, she failed to mention this when she "validated" Plaintiff's interest in the opinion in September.

49.     Upon information and belief, the Defendants *never* formally investigated Plaintiff's claims regarding Mr. Dykes' statement, deciding to rest, at least in part in Ms. Higgins' *post-hoc-facto* justification that Plaintiff's PRN status precluded her from the management position any ways.

50.     Likewise, upon information and belief, Mr. Dykes was never reprimanded for his patently discriminatory statements and hiring practices.

## The Fallout

51.     Southern Hills *immediately* began retaliating against Plaintiff in the wake of her filing of her ethics complaint regarding Mr. Dykes' comments and practices.

52.     In addition to being berated at the meeting purportedly to hear of. Plaintiff's concerns, immediately following this meeting, Plaintiff's hours were cut. The next published schedule included a noticeable difference in the number of charge shifts. Previously, even after switching to PRN, Plaintiff was working nearly all of her shifts as a charge nurse, which amounted to usually six or seven shifts per two-week pay period.

53.     However, on the very next schedule published *after* the December 30, 2021 meeting, Plaintiff had only one of six shifts as a charge nurse. This amounted not only to a diminution of her responsibilities, but also resulted in less pay given the $1/hour increase in pay for charge shifts.

54.     Further, on this schedule, Plaintiff was also removed from the training position, commonly called "precepting" new nurses which she had been actively involved in prior to the meeting. Shifts where a nurse acts as a preceptor came with an additional $2/hour.

55.     Plaintiff immediately informed Southern Hills of her concerns three times in writing.

56.     Then, on February 12, 2022, Plaintiff learned that Mr. Malugin had left his shift sometime around 3:00AM (approximately four hours *early*) leaving a recent graduate nurse who was still in training, and had at that time less than six months total experience) as the senior most nurse (and Southern Hills employee) in charge of Emergency Room.

57.     Plaintiff, believing in good faith that her own ethical reporting requirements subject to her licensure required her to report this incident because of the high likelihood of the impact to patient safety to leave an orientee in charge of the entire department, reported Mr. Malugin to Mr. Dykes.

58.     Mr. Dykes responded to Plaintiff's report that he knew that Mr. Malugin "might do that" because "he [Mr. Malugin] said he didn't have any one to watch his kids and didn't feel comfortable leaving them alone all night."

59.     Purportedly, the irony was lost on Mr. Dykes. After deciding not to consider or hire the Plaintiff because of her status as a mother with young children at home, his chosen (male) manager could not perform the duties because of childcare issues. However, instead of any reprimand or adverse action taken against Mr. Malugin for abandoning his shift, Mr. Dykes actively worked to assist Mr. Malugin cover his night shifts, despite being hired as the Night Shift Manager.

*The Retaliation Against Plaintiff Comes to a Head*

60.     After her ethics complaint and reporting Mr. Malugin for abandoning his shift, Southern Hills willfully and purposefully set about to create a hostile work environment for Plaintiff and sought to manufacture a reason to terminate her for her engaging in the protected conduct of lodging her complaints in good faith.

61.     On March 8, 2022, while on a charge shift, Plaintiff noticed that a patient assigned to another nurse was visibly agitated and in severe distress. The patient had been intubated, and the sedation had worn of – resulting in choking, vomiting, and a risk of asphyxiation. If he was not immediately re-sedated, the patient was at risk of pulling the already-inflated intubation tube out risking damage to his throat and vocal chords.

62.     Plaintiff observed the nurse assigned to the patient sitting down playing with her phone rather than tending to the patient. The patient's distress and the sounds he was making caused Plaintiff and two other hospital staff – including Department Manager Anthony Locklayer – to rush to aid the patient. The only physician in the department at the time was actively resuscitating another patient at the time, and, of course couldn't break away from actively saving a life to fill an order.

63.     Plaintiff and Mr. Locklayer were in agreement that the patient needed what is called a "bolus" – i.e. an immediate injection of propofol.

64.     By happenstance, Plaintiff was the one to personally administer the dose.

65.     Plaintiff drew the dose and administered it in the exact same fashion as she had been trained to do throughout her six years in the Emergency Room.

66.     The sedation was successful, and the patient suffered ___no adverse effects___.

67.     Mr. Locklayer texted Plaintiff later that day, to confirm that written documentation was "caught up" on other patients, but however, he did not mention this incident.

68.     The order for the bolus was later confirmed by the physician.

69.     However, Plaintiff received notice the next day, that she had been removed from the schedule for March 10, without pay, so that she could attend a "meeting" about the events from March 8.

70.     Southern Hills advised Plaintiff at that time that she was under investigation as to whether she had administered a drug without an order, and that she would be on administrative leave *without pay* during the pendency of the "investigation."

71.     Upon information and belief, prior to this event, Southern Hills had never put another nurse on administrative leave *without pay* prior to any investigation into the matter.

72.     Indeed, as Plaintiff would later learn, Southern Hills elected to take this drastic measure ***before*** it even contacted the physician to even verify whether there was a verbal order for the bolus.

73.     Further, as Plaintiff would learn, she was the only person subject to the investigation.

74.     The nurse that allowed the patient's sedation to wear off was not subject to this "investigation". Upon information and belief, she was not even reprimanded nor disciplined for playing on her phone while her patient was in distress.

75.     Likewise, Mr. Locklayer nor the other nurse that assisted in the administration of care for that patient were also not part of the investigation nor subjected to discipline.

76.     The investigation committee included: CNO Amy Higgins, and VP of HR Jennifer Garret, with Mr. Dykes. The same Mr. Dykes that Plaintiff had just levied a complaint of discrimination against. And the same Ms. Higgins that had chastised Plaintiff for an hour, refusing to investigate the merits of said complaint.

77. Upon learning that she was the only subject of this sham investigation, which was launched in such close proximity to her ethics complaint and reporting of Mr. Malugin, Plaintiff was left with no other choice but to believe that the investigation was clearly pretextual. Facing an investigation committee that was all already biased against her, and fearing the impact that the results of this biased investigation could have to her licensure, Plaintiff submitted a notice of constructive discharge on March 10, 2023, providing her last day of availability as March 24, 2023.

78. Southern Hills refused to accept Plaintiff's resignation by constructive discharge.

79. During the pendency of this sham investigation, Plaintiff was left on the schedule. Mr. Dykes would remove her from shifts at 8pm the night before any given shift.

80. For the next fifty days, Southern Hills left Mrs. Davis on unpaid administrative leave despite the notice of constructive providing only two weeks of continued availability. Because Southern Hills left her on the schedule, removing her only the night before, Plaintiff was not free to seek other employment at risk of "abandoning" shifts putting her license at jeopardy.

81. During this time, on April 25, 2022, Mr. Brad Fister, the Ethics and Compliance investigator for Southern Hills, confirmed on the phone to Mrs. Davis that there was no wrongdoing on her part and that the physician had verified the order for the bolus. Upon information and belief, this call occurred on a recorded line. Mrs. Davis confirmed this conversation in emails to Ms. Garrett and Ms. Higgins on April 25, 2022, May 31, 2022, and June 3, 2022.

82. That same day, Mrs. Davis asked Ms. Garrett and Ms. Higgins whether she would receive compensation for this time she was subjected to unpaid administrative leave.

83. Despite acknowledging that Mrs. Davis had not done anything wrong with the bolus on March 8, 2022, Southern Hills refused to pay Mrs. Davis for the fifty days that it left her on

administrative leave and actively precluded her from seeking other employment. In this same email exchange, Southern Hills acknowledged that it had underpaid Mrs. Davis for previous shifts, but refused to pay her for the time on administrative leave.

84.     On June 14, 2022, Mr. Fister again emailed Mrs. Davis and "it was determined [she] did not administer a narcotic without physician awareness." However, Mr. Fister, continued that I allegedly "did violate hospital policy as it pertains to the appropriate and safe manner in which to administer a bolus [propofol] utilizing the Alaris Pump through the closed intravenous system. It was substantiated you failed to follow safe and appropriate medication administration policy and process."

85.     This June 14, 2022 email was the first time that Southern Hills had ever indicated that Mrs. Davis was under investigation for the *method* that the bolus was administered. Again, as discussed above, the notice given stated that she was under investigation as to whether she had administered a drug without an order

86.     Mrs. Davis has repeatedly requested a written copy of the policy that Southern Hills alleges she violated. However, despite her repeated requests, no such "policy" has ever been produced.

87.     Upon information and belief, this "policy" is a *post-hoc-facto* application of a new policy at Plaintiff's expense and in retaliation to my good faith charges of discrimination. This is especially true given the fact that Southern Hills proverbially moved the goal posts of the investigation – first investigating as to whether there was an order, then, upon discovering that there was an order, manufacturing *any* reason to terminate Mrs. Davis in retaliation for her engagement in protected conduct.

88. Plaintiff administered the bolus on March 8 in the same manner as she always had – as Southern Hills had trained her to do.

89. Indeed, during the March 10 meeting, Plaintiff advised Ms. Higgins that another nurse administered the same drug on the same day and in the same fashion as her. Upon information and belief, this other nurse was not subjected to any adverse employment acts: she was not placed on administrative leave without pay; she was not subjected to any investigation; she was not subjected to any diminution in pay; and she wasn't even reprimanded.

90. As a result of Defendants' conduct as described herein, Plaintiff has suffered humiliation, extreme mental anguish, damage to her reputation, and financial hardship.

91. Because of the sudden nature that she was placed on administrative leave without pay, and because she was not able to seek other employment, she has suffered financial hardships due to the lack of income.

92. She has suffered clinical depression because of Defendants' conduct which has manifested physical symptoms.

## COUNT I – DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Against all Defendants)

93. Plaintiff repeats and realleges each of the foregoing paragraphs as if stated fully herein.

94. Plaintiff is a member of a protected class in that she is a woman and mother.

95. As described in this Complaint, Defendants have engaged in unlawful discrimination against Plaintiff based on her gender and status as a mother.

96. To wit, exactly two years after Mr. Saunders had engaged in similar discriminatory hiring practices against Plaintiff which led to his termination, Mr. Dykes and Southern Hills

elected not to consider Plaintiff for the management position despite her "validated" interest in the position, because of Plaintiff's status as a woman and mother to young children.

97.     As alleged above, Mr. Dykes' expressly told Plaintiff, "Kristen, I just wanted to let you know that I didn't consider you for the manager position because, you know, you have young kids at home – I didn't think you would want it."

98.     Plaintiff was well qualified for the position – as demonstrated by the fact that Defendants chose a male with far less experience and fewer certifications than Plaintiff for the position. Indeed, Plaintiff was the only employee with the key certification of "Certified Emergency Nurse." Not even Mr. Dykes has that certification. Clearly, Plaintiff was well qualified for the management position.

99.     Southern Hills did not select Plaintiff for the position despite "validating" her interest in the position via email. In fact, as described herein Defendants took active measures to prevent Plaintiff from applying for the position after validating her interest including but not limited to:

- Mr. Dykes advising her that prior to posting the position that he had already selected his friend from another facility for the position;

- Posting the second position during the time that Mr. Dykes knew that Plaintiff was out of town for the Christmas Holiday;

- Fast-tracking the hiring process by posting, interviewing, and selecting the male candidate within the span of one week, which includes the Christmas and Winter holidays – December 21 through 28, 2021; and

- Upon information and belief, only interviewing one candidate (Mr. Malugin) despite Southern Hills' policy of requiring at least two applicants and interviews prior to any employment decision.

100. Defendants selected an employee from outside of Plaintiff's class – a male, with less experience and qualifications than Plaintiff.

101. As a result of the Defendants' conduct described herein, Mrs. Davis has suffered actual and emotional damages in an amount to be proven at trial.

## COUNT II – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Against all Defendants)

102. Plaintiff repeats and realleges each of the foregoing paragraphs as if stated fully herein.

103. Plaintiff engaged in protected conduct, namely, reporting perceived discrimination in good faith to the appropriate authorities for Defendants.

104. As described above, Plaintiff immediately emailed senior staff to report Mr. Dykes' discriminatory comments and conduct regarding *why* he chose a male with less experience than Plaintiff for the manager role. In this email, Plaintiff requested a meeting to discuss her concerns in good faith.

105. Defendants immediately set forth on a campaign of retaliation creating a hostile work environment for Plaintiff.

106. This hostile work environment started at this meeting. During the meeting, Defendants, especially Ms. Higgins, berated Plaintiff, made jokes at her expense, and refused to discuss Mr. Dykes' discriminatory conduct or Plaintiff's concerns. No investigation was done to validate Plaintiff's concerns – despite Mr. Dykes affirming that he made the discriminatory comments in front of Plaintiff's colleague, Ms. Patrice Carter.

107.   Immediately following the meeting, Plaintiff saw a cut in both the total number of shifts which she could work and a diminution in her responsibilities given the lack of charge nurse positions on the very next published schedule.

108.   Plaintiff further engaged in protected conduct when she reported Mr. Malugin for abandoning his shift and patients to Mr. Dykes.

109.   Since engaging in this protected conduct, Defendants sought a pretextual reason to terminate Plaintiff.

110.   This pretextual reason came on March 8, 2022.

111.   As described herein, there was nothing unusual about Plaintiff's conduct on that day as she administered the bolus in the presence of three other hospital staff, including her supervisor, Mr. Locklayer. Mr. Locklayer said nothing at the time about whether the bolus was needed, whether there was a lack of an order for the bolus, nor the method in which Plaintiff administered it.

112.   Yet, on March 9, 2022, without any advance notice, Defendants placed Plaintiff on administrative leave *without pay* alleging that Plaintiff had administered a drug without a physician's order.

113.   Clearly this was pretextual given Defendants placed Plaintiff on administrative leave ***prior to*** even checking with the physician as to whether there was in fact an order.

114.   For the next fifty days, Defendants kept Plaintiff on leave without pay refusing to accept her notice of constructive termination – despite acknowledging on April 25, 2022 that she had done nothing wrong.

115.   Then, in furthering their efforts to manufacture a pretextual reason to terminate Plaintiff for engaging in protected conduct, Defendants decided to "accept her resignation in lieu

of termination" and refused to pay Plaintiff for the time on administrative leave, alleging that she administered the bolus in a manner contrary to hospital policy. This too is clearly pretextual because:

- Defendants have failed to produce any written policy to support their claims despite Plaintiff's repeated requests;

- Defendants originally advised that Plaintiff was on leave because she administered the bolus without an order, but did not make any mention of the method which it was administered until after they learned that there was, in fact, an order;

- Plaintiff administered the bolus in the same manner as she was trained to do by Southern Hills representatives, and as she had always done in the six years she was employed there;

- The incident in question occurred during the first few hours of Plaintiff's twelve-hour shift. Plaintiff administered the bolus in the presence and under the supervision of her direct supervisor, Mr. Locklayer, who said nothing at the time nor during the remainder of Plaintiff's shift that day – i.e. if the Defendants truly felt that Plaintiff has done something to jeopardize patient safety, why would Mr. Locklayer allow Plaintiff to work the remainder of her shift (a period of at least eight hours) after he witnessed this alleged policy violation.

- Upon information and belief, Plaintiff is aware of another nurse administering a bolus in the exact same fashion as Plaintiff is alleged to have done on the same day to another patient. This other nurse has faced no adverse employment actions.

- Upon information and belief, Plaintiff is aware of ample other nurses who were trained to administer the bolus during emergent situations in the same manner as

she is alleged to have done on March 8, 2022 – none of which have faced adverse employment actions as a result of administering boluses in that fashion.

- Upon information and belief, Defendants made no investigation or inquiry into other nurses who had engaged in the exact same conduct regarding the administration of boluses. That is, Plaintiff is the *only* nurse subjected to adverse employment actions for the conduct regarding the administration of boluses despite others engaging in the exact same conduct.

116.     As a result of the Defendants' conduct described herein, Mrs. Davis has suffered actual and emotional damages in an amount to be proven at trial.

### COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against all Defendants)

117.     Plaintiff repeats and realleges each of the foregoing paragraphs as if stated fully herein.

118.     As described herein, Defendants acted in outrageous conduct, including but not limited to, berating Plaintiff, making jokes at her expense, and creating a hostile work environment after she reported Mr. Dykes' discriminatory conduct, disparaging Plaintiff, and forcing her to stay on administrative leave without pay – leaving her on the schedule *after* the period contained in her notice of constructive termination preventing her from seeking other employment.

119.     As described herein, Defendants, at all times relevant to this Complaint, acted intentionally and/or with reckless disregard for the probability (and actuality) of causing Plaintiff emotional distress.

120.     As described herein, Plaintiff has actually suffered severe emotional distress including humiliation, indignity, and clinical depression, which has manifested physical symptoms.

<u>**COUNT IV – DECLARATORY RELIEF**</u>
**(Against all Defendants)**

121.     Plaintiff repeats and realleges each of the foregoing paragraphs as if stated fully herein.

122.     As described herein, an actual controversy exists between the parties – namely whether Plaintiff violated any then-in-effect policies by the method to which she administered the bolus. A determination of this controversy will affect Plaintiff in numerous ways – namely whether or not she is eligible for rehire, whether she is entitled to any unemployment benefits, and whether Defendants should be able to discuss the results of the investigation to any potential employers.

123.     The Defendants, without providing the alleged policy, have alleged that Plaintiff violated hospital policy, and that they were accepting her resignation "in lieu of termination". However, Plaintiff did not resign – rather, as described herein, provided her notice of constructive termination.

124.     Further, Plaintiff was employed by Defendant Southern Hills for over six years. Any putative employer for Plaintiff will likely want to know the reason she left their employment, and the circumstances surrounding her departure. Defendants should not be allowed to discuss the results of this sham investigation and its results given the clear retaliatory animus against Plaintiff.

125.     Plaintiff is entitled to – and hereby seeks – judicial determination of this controversy, and judicial determination is appropriate to determine: whether or not Plaintiff actually violated any then-in-effect policies; whether Plaintiff was constructively terminated; whether Plaintiff should be eligible for unemployment benefits; and whether or not Plaintiff should

be eligible for rehire with Defendant Southern Hills or it's Parent Company, HCA – the single largest healthcare employer in the state, if not the country.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants, inclusive of each and all of them, jointly and severally, as follows:

1. That her Complaint be tried before a jury of her peers;

2. For a determination that Defendants discriminated against Plaintiff based on her membership of a protected class – namely that as a woman and that as a mother – by refusing to consider her for promotion opportunity, instead hiring a male candidate with less experience and fewer qualifications;

3. For a determination that Defendants retaliated against Plaintiff for engaging in protected conduct – namely reporting Mr. Dykes' discriminatory comments and conduct – by creating a hostile work environment and subjecting her to adverse employment actions for merely pretextual reasons;

4. For actual and consequential damages according to the proof, in an amount to be proven at trial, but upon information and belief is in excess of $100,000;

5. For punitive in exemplary damages, in an amount to be proven at trial;

6. A declaration that Plaintiff did not violate any then-in-effect hospital policies on March 8, 2022; that Plaintiff was constructively terminated; and that Plaintiff is eligible for rehire;

7. A permanent injunction barring Defendants from any further discriminatory and retaliatory conduct in violation of Title VII of the Civil Rights Act;

8. A permanent injunction barring Defendants from disparaging and defaming Plaintiff to any future employers and barring Defendants from discussing the existence or results of the investigation into Plaintiff regarding the events of March 8, 2022;

9. For court costs and attorneys' fees incurred in bringing the instant action and underlying EEOC charge;

10. For pre- and post-judgment interest according to proof;

11. For any other such relief as this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), and otherwise, Plaintiff respectfully demands a trial by jury.

Respectfully submitted this the 10th day of September, 2023.

Kristen Noel Davis

By: /s Michael R. Giaimo
Michael R. Giaimo, BPR#019394
Crabtree & Patterson
Attorney for the Plaintiff
310 E. Broad Street, Suite A
Cookeville, Tennessee 38501
(931) 528-3330
mrgiaimo@yahoo.com